**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TIMOFEY V and<br>ANO DIALOG<br><br>                        Petitioners<br><br>       v.<br><br>UNITED STATES DEPARTMENT OF<br>JUSTICE<br><br>                       Respondent | Civil Action No. |

**MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR RETURN
OF SEIZED PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g)**

Respectfully submitted,

**PIETRAGALLO GORDON ALFANO
BOSICK AND RASPANTI, LLP**

By:    */s/ Scott A. Coffina*
        Scott A. Coffina, Esquire (67791)
        Joshua D. Hill, Esquire (93772)
        1818 Market Street, Suite 3402
        Philadelphia, PA 19103
        *sac@pietragallo.com*
        *jdh@pietragallo.com*
        (215) 988-1441 (Telephone)
        (215) 981-0082 (Telecopy)

Date: December 26, 2024

        *Counsel for Petitioners,*
        *Timothy V. and* ANO Dialog

# **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................... 1

II.   BACKGROUND ....................................................................................... 2

      A.    The Seizure of the waronfakes.com Domain ............................... 2

      B.    The Acquisition and Independent Journalism of Waronfakes.com ...................... 5

      C.    Minimal Visits to Waronfakes.com from the United States .................................. 8

      D.    No Significant Coverage of U.S. Elections ............................................... 9

      E.    Summary of the Russia-Focused Activities of Dialog........................... 10

            1.    Similar Organizations in the United States ............................... 11

III.  ARGUMENT ....................................................................................... 12

      A.    The Government Has Displayed a Callous Disregard for the Constitutional
            Rights of Petitioners................................................................... 13

      B.    Petitioners Have an Individual Interest in and Need for the Property They
            Want Returned ........................................................................ 15

      C.    Petitioners Will be Irreparably Harmed by Denying Return of the Property ....... 15

      D.    Petitioners Have no Adequate Remedy at Law .................................... 15

      E.    Other Considerations ................................................................. 16

            1.    There is No Risk to the Government from Returning the
                  Domain Name .................................................................... 16

IV.   REQUEST FOR LIMITED DISCOVERY ........................................... 16

V.    CONCLUSION.................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Carpenter v. United States*, 585 U.S. 296 (2018) .......................................................... 13

*Chaim v. U.S.*, 692 F.Supp.2d 461 (D.N.J. 2010) ..................................................... 13, 15

*Gillard v. Schmidt*, 579 F.2d 825, 1978 U.S. App. LEXIS 10363, *6 (3d Cir. 1978)................... 13

*Gulf Coast Pharm. Plus v. United States*, 2023 WL 3099873, at *3
   (S.D. Miss. Apr. 26, 2023)........................................................................... 12

*Kentucky v. King*, 563 U.S. 452 (2011)..................................................................... 13

*Lindell v. United States,* 82 F.4th 614 (8th Cir. 2023)................................................... 12

*Matter of Ninety-One Thousand Dollars in U.S. Currency*, 715 F. Supp. 423 (D.R.I. 1989)...... 12

*Richey v. Smith.* 515 F.2d 1239 (5th Cir. 1975)........................................................... 12

*Trump v. United States,* 54 F.4th 689 (11th Cir. 2022) ................................................ 12

*United States v. Kama,* 394 F.3d 1236 (9th Cir. 2005).................................................. 12

*United States v. Pitts,* 639 F. App'x 105 (3d Cir. 2016) ............................................... 12

*United States v. Vayner*, 769 F.3d 125 (2nd Cir. 2014)................................................. 14

**Statutes**

18 U.S.C. § 981 et seq................................................................................................. 5

18 U.S.C. § 983 ..................................................................................................... 2, 5

Russian Civil Code Article 123.24................................................................................ 10

**Rules**

Rule 41(e)(2) ........................................................................................................... 12

Rule 41(g) of the Federal Rules of Criminal Procedure .................................................. 1, 2, 12 16

**Constitutional Provisions**

U.S.CONST. AMEND.IV. ........................................................................................................... 13

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| TIMOFEY V and<br>ANO DIALOG | Civil Action No. |
|           Petitioners |  |
|    v. |  |
| UNITED STATES DEPARTMENT OF<br>JUSTICE |  |
|         Respondent |  |

## MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR RETURN
## OF SEIZED PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g)

**I.**     **PRELIMINARY STATEMENT**

Timofey V f/k/a Timofey Vasiliev ("**Timofey V**") and ANO Dialog ("**Dialog**") (collectively, "**Petitioners**") respectfully submit this Memorandum of Law, together with the supporting Declarations of Timofey V ("**Timofey V Decl.**") and Vladimir Tabak ("**Tabak Decl.**"), in support of their application, pursuant to Fed. R. Crim. P. 41(g), for the immediate release of one specific domain name, for the journalistic web site "waronfakes.com," currently being "held" by the Federal Bureau of Investigation ("FBI").

This Petition relates only to the domain name waronfakes.com; it does not concern the remaining 31 alleged so-called "Project Doppelganger" domain names seized on September 4, 2024, by the FBI, which are entirely unrelated to Petitioners or waronfakes.com. Petitioners have nothing to do with Project Doppelganger. They were not involved in any of the "cybersquatting" activities alleged in the government's Affidavit in Support of Seizure Warrant ("Seizure Affidavit"), any money laundering activities, or any attempts to influence the outcome of U.S.

elections. Petitioners vehemently deny, and the government has failed to show, any violations of U.S. law in connection with the registration and utilization of waronfakes.com.

The seizure of the domain is causing irreparable harm to Petitioners, harming their business and employees, and interfering with their right to pursue their legitimate journalistic activities. Prior to the seizure, waronfakes.com averaged approximately 45,000 daily unique visitors. The site employed a staff of twelve content creators and technical personnel, all but two of whom have now lost their jobs.

Given the lack of factual support for the seizure of this domain, the substantial hardship to Petitioners, the unavailability to Petitioners of any other remedy at law, and the absence of any risk that the seized domain names will be destroyed or otherwise made unavailable for any eventual trial, Petitioners respectfully request that the Court direct the government to return the domain name – www.waronfakes.com – as warranted under Fed. R. Crim. P. 41(g).

## II.    **BACKGROUND**

### A.    **The Seizure of the waronfakes.com Domain**

On September 4, 2024, the Department of Justice issued a press release captioned "*Justice Department Disrupts Covert Russian Government-Sponsored Foreign Malign Influence Operation Targeting Audiences in the United States and Elsewhere*"[1] announcing the seizure of 32 internet domains allegedly used in Russian government-directed "malign influence campaigns" collectively referred to as "*Doppelgänger.*"[2] The seizure of the domain names, including waronfakes.com, was based on a warrant issued by this Court in reliance on the Seizure Affidavit,

---

[1] *See* https://www.justice.gov/opa/pr/justice-department-disrupts-covert-russian-government-sponsored-foreign-malign-influence

[2] The Government failed to provide Timofey V with proper notice of the domain's seizure as required by U.S.C. §983(a)(1)(A)(i). This procedural deficiency alone warrants immediate return of the domain pending proper proceedings.

issued by an FBI agent, unknown to Petitioners. *See* Exhibit 1. The bases for the seizure, as outlined in the Seizure Affidavit, are alleged violations of U.S. money laundering and criminal counterfeiting laws. In conjunction with the Justice Department press release, the U.S. Treasury Department announced it was adding Petitioner Dialog to its list of Specially Designated Nationals ("SDNs").[3] In its description of Dialog, the Treasury Department alleges that it is engaged in U.S. election interference.[4] As explained below, however, Dialog is a nonprofit in Russia that is internally focused in its activity on Russia and its citizens. Dialog has nothing to do with the United States or its elections, and accordingly, the Treasury Department does not cite one example of a story or action by Dialog reflecting election interference in the United States.

According to the Seizure Affidavit, Dialog and other Russian entities have utilized "cybersquatted" domains which impersonate "legitimate news entities and unique media brands." As explained in the Seizure Affidavit, cybersquatting is "a method of registering a domain intended to mimic another person or company's domain" and to "trick Internet users into believing they are visiting the legitimate person or company's website."[5] The cybersquatting campaign is referred to throughout the Seizure Affidavit as "Doppelgänger." However, the Seizure Affidavit does not even allege – nor could it – that waronfakes.com is a counterfeit site, nor does it identify one web site or domain allegedly "cybersquatted" by Dialog.

The government also attempts to link Dialog with "Reliable Recent News" ("RRN") which it alleges is "a Russian disinformation website publicly linked to the Doppelgänger activity."[6] As explained below, however, there is no evidence presented by the government, other than pure conjecture, that Dialog or waronfakes.com are related to RRN.

---

[3] *See* https://home.treasury.gov/news/press-releases/jy2559
[4] *See id.*
[5] Seizure Affidavit at 1, n.1.
[6] *See* https://home.treasury.gov/news/press-releases/jy2559.

Waronfakes.com is addressed in a cursory manner in just three paragraphs of the 158-paragraph Seizure Affidavit (¶¶117, 118, & 129), which appear to rely solely on the findings of the "Viginum Report." Importantly, there is no evidence presented in paragraphs 117, 118, or 129 tying Petitioners to any money laundering or trademark infringement activities.

The Viginum Report was issued in July 2023 by a French government agency "tasked with vigilance and protection against foreign digital interference, which operates under the authority of the Secretariat-General for National Defense and Security." *See* Exhibit 2.

The Viginum Report fails to present any evidence that waronfakes.com, Dialog or Timofey V were involved in Project Doppelgänger. The supposed connection rests merely on allegations that some articles that appeared on waronfakes.com also appeared on the RRN website, which is hardly an unusual occurrence, given the ubiquity of news aggregators or people who "re-post" news items online. However, there is simply no evidence that Petitioners directed or authorized the re-printing of articles. There is also no description of the allegedly re-printed articles and how re-posting them violates U.S. law.

The Seizure Affidavit proffers no evidence other than the Viginum Report to establish a connection between RRN and waronfakes.com. The Report's sole technical "evidence" linking waronfakes.com to RRN is an unverified screenshot from a single X (formerly Twitter) user, claiming to show a login page redirect. The authenticity of this screenshot itself is highly questionable, since the URL address does not open any page and simply leads to an error message (https://rrussianews.com/?password-protected=login&redirect_to=https%3A%2F%2Flogin.waronfakes.com%2F). This type of unauthenticated social media content is unreliable and falls well short of establishing probable cause. Additionally, even if this unverified post from "X" did establish a connection between

waronfakes.com and RRN (it doesn't), the Seizure Affidavit does not contain any further information about how this supposed connection reflects or resulted in violations of U.S. counterfeiting or money laundering laws, in marked contrast to the detailed recitation of evidence about the other 31 seized domains.

On December 4, 2024, Timofey V and ANO Dialog, through undersigned counsel, emailed and hand-delivered a letter to Wayne A. Jacobs, Special Agent in Charge of the FBI Philadelphia Field Office, and to United States Attorney Jacqueline C. Romano, demanding return of the domain pursuant to 18 U.S.C. § 983(f)(1).[7] *See* Exhibit 3.  Neither agency responded to our correspondence, or to follow-up correspondence sent and hand-delivered on December 20, 2024, *see* Exhibit 4, and to date, the waronfakes.com domain name has not been released to Timofey V.

In sum, the seizure of waronfakes.com is a clear case of guilt by association, and only speculative association at that. Whatever the strength of the evidence supporting the seizure of the 31 other domains allegedly connected to Doppelgänger, the evidence concerning waronfakes.com is entirely lacking; the Court should order its return to its lawful owners.

**B.**      **The Acquisition and Independent Journalism of Waronfakes.com**

Timofey V is a journalist employed by Dialog. *See* Exhibit 5 (Timofey V Decl., ¶ 2 and his CV annexed thereto as Exhibit A). The Russian-language domain of the 'War on Fakes' project 'waronfakes.rf' was registered on February 24, 2022, using the Russian service reg.ru and paid for with a Russian bank card. *Id.*, ¶ 4. On or around March 1, 2022, Timofey V purchased the domain name called www.waronfakes.com, which was to be used for journalistic purposes and focused

---

[7] Although to our knowledge – Petitioners have not been notified even of the seizure of its domain name as of this date – the government has not initiated forfeiture proceedings, the government relied in part upon the civil forfeiture statute, 18 U.S.C. § 981 et seq., as a basis for its seizure of the 32 subject domains, including waronfakes.com.  Accordingly, pursuant to 18 U.S.C. § 983(f), Petitioners requested possession of their domain from the appropriate official and fifteen (15) days has passed without the domain name being returned or any response at all from the government.

primarily on political issues in Russia, with minimal content related to the United States. *Id.*, ¶ 3. The site was paid for with a Russian bank card at a cost of 1307 rubles. *Id.*, ¶ 4. The payment details are attached to the Timofey V Decl. as Exhibit B. Both domains were registered using the passport of Timofey V, (listed as 'Timofey Vasiliev', which is his former surname). *Id.*, ¶ 5.

The Seizure Affidavit at paragraph 83 describes the purchase of domain names allegedly associated with Project Doppelganger. Doppelganger appears to involve sophisticated methods to mask the true identities of the purchasers and their activities. These anonymous purchasers are likened to "Russian nesting dolls," employing several layers of VPN (Virtual Private Network) and VPS (Virtual Private Server), and using fake data, anonymizers, and cryptocurrencies to ensure anonymity and obfuscation.

The Seizure Affidavit does not describe the establishment of waronfakes.com in this surreptitious manner, however, because the acquisition of this domain name was far more transparent. It was purchased by Timofey V, who used his personal credit card and Russian passport details for the transaction, clearly identifying himself as the owner of the website. Timofey V's open and identifiable purchase of the domain contrasts sharply with the secretive methods allegedly employed by Project Doppelganger, suggesting that his actions were legitimate.

The Telegram channel and the Russian version of the website "War on Fakes" were created following the start of the military conflict in Ukraine on February 24, 2022. Exhibit 5 (Timofey V Decl., ¶ 6). The multilingual site waronfakes.com, which offers translations in five languages, was launched shortly thereafter, on March 1, 2022. The Russian version of the War on Fakes website was updated more frequently than the multilingual version. *Id.*, ¶ 7.

The mission of the "War on Fakes" project was to debunk what was from Petitioners' perspective the most widespread misinformation that appeared in Ukrainian or global media/social

networks and then moved to the Russian-language segment of the Internet. *Id.*, ¶ 12.  By way of example, waronfakes.com posted information to refute false stories emanating from Ukraine attributing the shelling of the Russian city of Belgorod on December 30, 2023, which killed at least 25 people and wounded over 100, to Russian air defence systems.[8] *Id.*, ¶ 14. Notably, the Washington Post, in a story dated January 13, 2024, similarly reported (among other Western news outlets, including The New York Times) that Ukraine was the source of the rocket and missile attack "in retaliation for one of Russia's biggest air attacks on Ukraine." *See* https://www.washingtonpost.com/world/2024/01/13/belgorod-russia-missile-strike-ukraine/ (last visited, December 24, 2024). *See also*, https://www.nytimes.com/2023/12/30/world/europe/ukraine-russia-belgorod-attacks.html (last visited December 24, 2024).

In this regard, waronfakes.com was not unlike fact-checking web sites we are well familiar with in the United States, such as Politifact.com, Factcheck.org, or the Washington Post Fact Checker, at https://www.washingtonpost.com/politics/fact-checker/.[9]

The intended audience of War on Fakes initially was the Russian populace. The project gained great popularity in the first days after its launch (more than 500,000 subscribers in the

---

[8] Sources for the "fake" news items include:  https://t.me/uniannet/121440, https://t.me/uniannet/121450, https://t.me/uniannet/121454,  and  https://t.me/uniannet/121464; while a waronfakes.com post refuting these accounts could be found at https://t.me/warfakes/19618. Other publications on the subject include: https://t.me/warfakes/19602?single, https://t.me/warfakes/19604, https://t.me/warfakes/19605, https://t.me/warfakes/19606, and https://t.me/warfakes/19610?single.

[9] It is a reality of social media and the plummeting trust in traditional media that allegations of spreading disinformation are routinely leveled against journalists, even so-called mainstream U.S. journalists. To provide context, even these U.S. fact-checking websites are themselves occasionally "fact-checked" and challenged for alleged bias. *See, e.g.*, "Prominent 'Fact Checker' Gets Fact-Checked by Reality," Mike Howell, *The Heritage Foundation*, January 11, 2022 (https://www.heritage.org/progressivism/commentary/prominent-fact-checker-gets-fact-checked-reality) (last visited, December 23, 2024).

Telegram channel), and within a week it was decided to translate key materials into major world languages. *Id.*, ¶ 12. This is how the idea of creating the website waronfakes.com and a Telegram channel of the same name was born. *Id.*

The actual management of the project was exercised by Dialog. Journalists and analysts employed by Dialog work on the content that appears on the waronfakes.com platform. To support the work of this portal, a multilingual project support group with four full-time translators was created. These four specialists were recruited throughout 2022, and their main task was to translate the texts of the War on Fakes into different languages. After the FBI seized the English domain name, these staff members, among others, were forced to resign due to a lack of work. *Id.*

**C.**    **Minimal Visits to Waronfakes.com from the United States**

To the extent War on Fakes stories were aimed at a Western audience, that audience was in Western Europe, not the United States. The waronfakes.com website and Telegram channel thus have not garnered significant attention or visits from the United States and other English-speaking countries. *Id.*, ¶¶ 16-17. Consequently, their influence in these regions has been minimal. However, the seizure of the subject domain is still causing severe and ongoing harm to Petitioners' legitimate business operations. Prior to the seizure, waronfakes.com averaged approximately 45,000 unique daily visitors. *Id.*, ¶ 18. The site employed a staff of twelve content creators and technical personnel, ten of whom have now lost their jobs with the web site.

The FBI's seizure banner currently displayed on the domain has created significant ongoing reputational damage, and many regular readers understandably will be deterred from returning to the site even if access is restored. *Id.* This chilling effect increases with each passing day, and readers are migrating to other operating sites, making resolving this matter of the utmost urgency.

### D.    No Significant Coverage of U.S. Elections

The overwhelming majority of articles published on waronfakes.com are unrelated to the United States or its elections; the focus of the platform has been dedicated to combating misinformation in connection with non-U.S. events occurring internationally, such as events in Russia, Ukraine, Israel and China. *See* Exhibit 5 (Timofey V Decl., ¶ 15). Since February 24, 2022, the Russian version (which obviously would have minimal reach in the United States) has published no more than 20 articles related to the U.S. elections, and the English version of the "War on Fakes" Telegram channel just 17 articles. *Id.*, ¶ 10.

Moreover, the stories related to the U.S. elections are virtually indistinguishable from the commentary we see from U.S. media outlets, and typically cite U.S. media stories as sources and support for their assertions. For example, on July 29, 2024, WaronFakes.com cited as "Fake News," the contention that President Biden voluntarily decided to "pass the torch to a new generation" by withdrawing from the presidential race. The post countered that claim with reporting from ABC News and political commentator Mark Halperin that Democratic party leaders had pressured President Biden to step away.   *See* Exhibit 6 (Image of July 29, 2024 waronfakes.com post, https://t.me/waronfakesen/5520). Similar stories about President Biden being pressured to withdraw were run by U.S. media outlets The Hill on July 21, 2024, *see* https://thehill.com/homenews/campaign/4784618-joe-biden-drops-out-what-to-know-kamala-harris-trump/ (last visited December 26, 2024), and Newsweek on August 11, 2024 (quoting President Biden admitting that he was pressured to withdraw), *see* https://www.newsweek.com/joe-biden-admits-dropped-out-race-pressure-democrats-1937532 (last visited December 26, 2024). Thus, a website post such as waronfakes.com's July 29 story, analysing a matter of worldwide concern such as the sitting U.S. President withdrawing from the

race four months before the election, citing U.S. news sources as support and consistent with "mainstream media" reporting, cannot reasonably be considered election interference or part of a "malign influence campaign."

      **E.**      <u>**Summary of the Russia-Focused Activities of Dialog**</u>

Dialog (https://dialog.info), established in 2019, is an Autonomous Non-commercial Organization ("ANO"), which is a non-membership organization undertaking services in the field of education, social policy, culture, and similar fields. *See* Russian Civil Code Article 123.24. An ANO in Russia is a legal entity established to provide services in various sectors such as education, health care, culture, science, law, sports, and other areas. This interdepartmental competence centre specializes in Internet communications and acts as a digital dialogue operator between the government and Russian society. *See* Exhibit 7 (Declaration of Vladimir Tabak ("Tabak Decl."), ¶¶ 6-7 and Exhibit A thereto (ByLaws).

The purpose of Dialog is to provide public relations and communications services. The Organization's activities include:

- Development of digital projects in the field of public relations and communications;

- Public opinion research;

- Formation of an effective system of communications in the information and telecommunication network of the Internet.

*Id.*, ¶ 8. In large part, Dialog has been tasked with handling citizen complaints, analytics, developing digital skills for public employees, disseminating socially significant information, and ensuring a safe digital environment for Russian citizens. *Id.*, ¶ 9.

Dialog's portfolio also includes combatting misinformation, including:

- Developing systems to counter misinformation, including the Noodle Media project, an aggregator for verifying information and educating on digital literacy.

- Has refuted 6,500 misleading narratives and processed over 205,000 messages through public chatbots, engaging 2.04 million users on social networks.

*Id.* Dialog's educational activities include:

- Created the Dialogue PRO platform with 190,000 registered users, offering educational content on media and digital literacy.

- Conducts over 8,000 annual training events, collaborates with universities on 80+ programs, and has trained 230,000 information security professionals.

- Holds an educational license to run its own programs and issue official documents.

- Dialog's comprehensive efforts aim to enhance communication between the government and citizens, support informed decision-making, and improve digital literacy and information security across Russia.

*Id.*

      1.    <u>Similar Organizations in the United States</u>

There are a multitude of nonprofit organizations in the United States, such as Pew Research, Connected Nation, and Code for America, that perform similar roles here to those Dialog serves in Russia. Tabak Decl., ¶ 10. Such organizations and platforms share similar goals with Dialog by leveraging technology to enhance government-citizen interactions, streamline public services, and ensure efficient communication and service delivery. In the United States, clearly there are also many local government websites and citizen-feedback management tools for government, including analytics and reporting. Dialog has performed  such functions in Russia. *Id.*, ¶ 11.

Dialog has nothing to do with "Project Doppelganger," money laundering, or trademark infringement. *Id.*, ¶ 12. The domain waronfakes.com is just one of the many projects that it has supported.

III.   **ARGUMENT**

Rule 41(g) of the Federal Rules of Criminal Procedure allows "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property [to] move for the property's return . . . . If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings."   Fed. R. Crim. P. 41(g).   The rule also provides that "[t]he court must receive evidence on any factual issue necessary to decide the motion." *Id.*

"A Rule 41(g) motion for the return of property is an independent civil action for equitable relief." *United States v. Pitts,* 639 F. App'x 105, 107 (3d Cir. 2016).  "Where a Rule 41(g) petition is made by a party against whom no criminal charges have been brought, such a motion is in fact a petition that the Court invoke its civil equitable jurisdiction." *Gulf Coast Pharm. Plus v. United States*, 2023 WL 3099873, at *3 (S.D. Miss. Apr. 26, 2023); *Matter of Ninety-One Thousand Dollars in U.S. Currency*, 715 F. Supp. 423, 427 (D.R.I. 1989) ("[F]ederal courts have variously found the authority to hear pre-indictment motions for return of property not only in the statutory grant of jurisdiction embodied in Rule 41(e)(2) but also in the longstanding, non-statutory doctrine of equitable or 'anomalous' jurisdiction . . . .").

District courts are guided by the test set out by the Fifth Circuit in *Richey v. Smith.* 515 F.2d 1239, 1243 (5th Cir. 1975). *See e.g., Lindell v. United States,* 82 F.4th 614, 619 (8th Cir. 2023); *Trump v. United States,* 54 F.4th 689, 697 (11th Cir. 2022); *United States v. Kama,* 394 F.3d 1236,1238 (9th Cir. 2005). *Richey* lists four factors to be considered in deciding whether to exercise its equitable jurisdiction over a Rule 41(g) motion. *Richey,* 515 F.2d 1239 at 1243. These factors are:

       1)    whether the Government displayed a callous disregard for the constitutional rights of the movant;

2)      whether the movant has an individual interest in and need for the property he wants returned;

3)      whether the movant would be irreparably injured by denying return of the property; and

4)      whether the movant has an adequate remedy at law, may suffice to support the district court's determination in a given case.

*Id.  See also, Chaim v. United States,* 692 F.Supp.2d 461, 467 (D.N.J. 2010).

An analysis of these factors weighs in favor of the return of waronfakes.com to Petitioners.

**A.      <u>The Government Has Displayed a Callous Disregard for the Constitutional Rights of Petitioners</u>**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S.CONST. AMEND.IV. The "basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 585 U.S. 296, 303 (2018); *Gillard v. Schmidt*, 579 F.2d 825, 827, 1978 U.S. App. LEXIS 10363, *6 (3d Cir. 1978). The Fourth Amendment "expressly imposes two requirements.  First, all searches and seizures must be reasonable.  Second, a warrant may not be issued unless probable cause is properly established, and the scope of the authorized search is set out with particularity." *Kentucky v. King*, 563 U.S. 452, 459 (2011).  As the text of the Fourth Amendment makes clear, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'"  *Id.* at 381-82.

In the instant matter, although it secured a warrant to seize 32 Internet domains, the government has failed to set forth a sufficient basis for its seizure of waronfakes.com in particular.  Whatever one might argue about the level of evidence to support the seizure of the other so-called "Doppelganger" domains, the evidence purportedly connecting Petitioners'  legitimate news

analysis website to the alleged "Doppelganger" campaign and supporting its seizure is remarkably thin. The Seizure Affidavit discusses waronfakes.com in a cursory fashion in just three paragraphs (¶¶'s 117, 118 & 129) and relies almost entirely on a year-old French government report (the "Viginum Report") rather than independent investigation. In particular, the Affidavit fails to:

1)   Identify even one "fake" story aimed at U.S. audiences authored by Timofey V and posted on waronfakes.com;

2)   Present evidence of any trademark infringement or money laundering activities related to waronfakes.com;

3)   Demonstrate any attempt to improperly influence the 2024 U.S. presidential election; or

4)   Establish that any sanctioned person was involved in the purchase or registration of the domain.

The government's sole technical "evidence" linking waronfakes.com to "Doppelganger" is an unverified screenshot from a single X (formerly Twitter) user claiming to show a login page redirect. This type of unauthenticated social media content is unreliable and falls well short of establishing probable cause. *See*, *e.g.*, *United States v. Vayner*, 769 F.3d 125, 131-32 (2nd Cir. 2014) (holding district court abused its discretion in admitting printout of defendant's profile page to authenticate account where government presented no other evidence tying the page to defendant).

Moreover, the government's failure to (1) provide notice of the seizure, or (2) even respond to Petitioners' letter demanding return of the waronfakes.com domain given the significant issues Petitioner has raised reflect continued callous disregard by the government for Petitioners' valid property rights.

**B.**    **Petitioners Have an Individual Interest in and Need for the Property They Want Returned**

The Timofey V and Tabak declarations have established that Petitioners have a right, interest, and need for the waronfakes.com domain. The creation of the waronfakes.com website and Telegram channel required an enormous amount of effort, including significant investments in advertising, graphic design, programming, website development, promotion, and audience building - all of which were essential components required to build a successful website with an established subscriber base.

**C.**    **Petitioners Will be Irreparably Harmed by Denying Return of the Property**

As stated above, the seizure of the subject domain is causing severe and ongoing harm to Petitioners' legitimate business operations. Prior to the seizure, waronfakes.com averaged approximately 45,000 daily unique visitors. The site employed a staff of twelve content creators and technical personnel, all of whom are now unable to perform their duties, and ten of whom have been laid off. The FBI's seizure banner currently displayed on the domain has created significant ongoing reputational damage, with many regular readers expressing fear of returning to the site even if access is restored. This chilling effect increases with each passing day, making resolving this matter of the utmost urgency.

**D.**    **Petitioners Have no Adequate Remedy at Law**

The Court should exercise its equitable power and order the return of the domain name to Petitioners because they have no adequate remedy at law. To Petitioners' knowledge, there have been no indictments filed related to the seizure of the 32 domain names on September 4, 2024, and the government has not initiated forfeiture proceedings. This Court and this petition thus represent the only appropriate avenue for Petitioners to pursue the rightful return of their improperly seized and retained domain name. *See*, *e.g.*, *Chaim v. U.S.*, 692 F.Supp.2d 461 (D.N.J. 2010) (Rule 41(g)

motion dismissed because petitioner had alternative avenue to contest seizure of property in ongoing criminal case).

      **E.**      <u>**Other Considerations**</u>

      1.      <u>There is No Risk to the Government from Returning the Domain Name</u>

The Court can return the subject domain without risk.  Waronfakes.com was and remains registered with VeriSign Global Registry Services, a U.S. company located in Reston, VA. The domain will remain under the control of U.S.-based registries and registrars regardless of its operational status. There is no risk that the domain name will be unavailable for future proceedings. The government's suggestion that future domain renewal payments might be made by sanctioned persons is purely speculative, and thus cannot serve as a basis to continue retaining the domain.

Given that it is the government's burden to present tangible evidence of unlawful conduct, the seizure on waronfakes.com is unauthorized as no such evidence has been presented. Absent some cogent explanation by the Government of what evidence they are actually relying on, besides some report from France from 1½ years ago, which cites no direct evidence, the Application should be granted outright.

**IV.**      <u>**REQUEST FOR LIMITED DISCOVERY**</u>

The Court is required by Rule 41(g) to "receive evidence on any factual issue necessary to decide the motion."  Because at issue here is the sufficiency of the evidence to warrant seizure of *waronfakes.com* – as opposed to the other 31 domains allegedly connected to "Project Doppelganger" – Petitioners request the Court to order limited discovery, specifically, document requests focused on the evidence (or lack of evidence) purportedly tying this web site to the Doppelganger campaign and/or to the proffered statutory seizure predicates of counterfeiting and money laundering and connecting waronfakes.com to the illegal conduct of other alleged

participants in Doppelganger. Petitioners have already informally requested certain documents substantiating the seizure of the waronfakes.com domain specifically, in its unanswered correspondence to the government. Petitioners believe that access to this information will help streamline the parties' arguments and expedite resolution of this matter by the Court, if not by the parties themselves.

## V.  **CONCLUSION**

There is indeed a lack of evidence presented in the Seizure Affidavit tying Petitioners or the waronfakes.com domain to any illegal conduct. Additionally, the seizure is causing irreparable harm to Petitioners. Accordingly, Petitioners respectfully request that this Court direct the government to return this subject domain forthwith.

Respectfully submitted,

**PIETRAGALLO GORDON ALFANO BOSICK AND RASPANTI, LLP**

By:    */s/ Scott A. Coffina*
Scott A. Coffina, Esquire (67791)
Joshua D. Hill, Esquire (93772)
1818 Market Street, Suite 3402
Philadelphia, PA 19103
*sac@pietragallo.com*
*jdh@pietragallo.com*
(215) 988-1441 (Telephone)
(215) 981-0082 (Telecopy)

Date: December 26, 2024

*Counsel for Petitioners,  Timothy V. and* ANO Dialog

*11202434*

17